## THE INLAND.

## THE JAMES EDWARD.

### THE MONITOR.

#### Nos. 16342, 16371.

District Court, E. D. New York.
May 28, 1942.

266

Purdy & Lamb, of New York City (Edmond F. Lamb and Vincent A. Catoggio, Jr., both of New York City, of counsel), for Pfeifer Oil Transp. Co., Inc.

Vincent A. Catoggio, Jr., of New York City, for Monitor Towing Co.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for Essex Transp. Co.

GALSTON, District Judge.

The libels and cross libels were filed as a result of a collision between the barge Inland and the tug James Edward.

On the morning of January 18, 1941, the tug Monitor had the barge Inland in tow on the tug's port side, stern first, with water ballast in the after peak of the Inland, and was proceeding from Flushing on her way to Bayonne. She had safely proceeded down the East River and passed on the west side of Governor's Island and was heading for the entrance to the Bayonne Terminal Channel. At about the same time the James Edward, with a Sun Oil barge loaded with cargo on her starboard side, the barge also being towed stern first, was bound down the Bayonne Channel for Newtown Creek.

The Monitor had picked up the Inland at Sunrise Oil, College Point, at about 5:20 A. M. The weather was foggy, and as the tow proceeded down the East River, fog signals were blown at short intervals. As they proceeded past Governor's Island, Buoy No. 31, flashing green, was to the starboard, and from there the course was set by compass southwest, heading for Bayonne Terminal Channel. Buoy No. 2 marks the entrance to that channel. It is the contention of the Monitor that on that course the captain made out a flotilla approaching which appeared to be headed north as it came down the Bayonne Channel, for, as he said, it blocked out the buoy. Tarter, the master of the Monitor, intended to pass starboard to starboard, for he picked up the tow lights and the running lights. At that time, according to his estimate, the James Edward was approximately 500 feet away. Then, so it seemed to him, the ap-

proaching flotilla changed its course to the eastward, "his green lights seemed to turn away from me, the starboard light; his port light came in sight". At that time the two tows were about 300 feet apart and the Monitor started to swing to port to give the Edward clearance, rang an alarm, gave backing signals, and had the engines going astern, but the other flotilla, according to Tarter's version of the accident, continued to cross his bow and contact followed between the port stern corner of the Inland and the tug James Edward.

The Edward and her tow had left the entrance of the Bayonne Terminal Channel with all lights up on both the Sonoco No. 3 and the Edward, bound for Newtown Creek, and were headed on an easterly course below Governor's Island, with the intention of going up Buttermilk Channel. They were making about three miles an hour. The tide was ebb, the tide in Buttermilk Channel being the first of the flood tide. Up to the time of the collision there was no change of heading from an easterly direction to the northward, as some of the Monitor witnesses seemed to believe, nor then back to an easterly course. The Monitor flotilla was observed coming down past Governor's Island at the southwesterly end, headed southwest by west. Gibbons, the master of the Edward, who was in the pilot house, said that had the Monitor pursued her course she would have cleared the stern of the Edward by 500 or 600 feet. No passing signals were exchanged. Gibbons said that the Monitor was about 900 feet distant when first sighted by him; that it kept coming down and when about 600 feet away, the Monitor turned to port and was coming on towards the Edward. The Edward then blew an alarm and then a second alarm, and then the Edward endeavored to keep away by pulling to the southeast, but the Monitor came on and hit the Edward with the port stern corner of the barge Inland, at the pilot house. That contact caused the lines between the Monitor and the Inland to break, so that the Monitor came on again and hit the Edward amidship at the engine room. Gibbons saw nobody on the barge at or before the time of contact. The place of contact is marked by Gibbons at six-tenths of a nautical mile from the red flashing buoy which marks the entrance to the Bayonne Channel. The collision took place at about 6:50 A. M., at which time there was, according to the Weather Bureau of the United States De-

partment of Commerce, a moderate fog, with visibility of about a half a mile.

I think the respective courses of the two tows as described by Gibbons is to be accepted over that described by Tarter and other Monitor witnesses. There was no reason whatsoever for the Edward to head northward, nor was there any reason for the Monitor, in coming from the Battery, past Governor's Island, and heading for the entrance to Bayonne Channel, to follow the course so far to the west of Governor's Island, described by Tarter. Moreover, I credit the testimony of Captain Ehmsen of the Sunoco No. 3, who was in excellent position to observe the heading, not only of the Edward, but also of the approaching tow. He confirmed Gibbons not only in the relative courses of the two tows, but also in respect to the sounding of alarms.

The Monitor, with the light barge Inland, was proceeding at six miles an hour. The testimony of those on the Monitor that the black object which they saw with two lights was coming up the river was not in any way convincing. The deck-hand on the Monitor, who was stationed in the pilot house with the captain, said that the Monitor turned its course to port a little to give the Edward plenty of clearance between the Monitor and the buoy, and that when the Edward got closer, within 400 or 500 feet, she took a sharp starboard turn at right angles; but in cross examination he said that within half a minute after sighting the black object the Monitor had made the turn to port. There is no foundation for the alleged assumption by both Tarter and Zelno, the deck-hand of the Monitor, that the Edward was pursuing a northerly course up the river. They both admitted that if the flotilla from Bayonne to Buttermilk Channel had pursued an easterly course, and the Monitor had continued on a southwesterly course without change of course to port, the Monitor could have passed under the Edward's stern. It would appear from all the circumstances of the case that the false belief of the Monitor was based on faulty lookout. The deck-hand should not have been in the pilot house, and it is curious that the bargeman on the Inland had moved from his position at the cabin end of the barge about a half minute before the collision; and then at that time he came over to the deck. Whether this bargeman had moved from his position before Tarter had picked up the other flotilla or after is left in doubt

by Tarter's testimony. Apparently no report was received from the bargeman and it would appear that no lookout was stationed on the towing end of the barge Inland prior to and at the time of the collision.

Another circumstance which rather points to the fact that the two in the pilot house were not giving the most careful attention to traffic in that vicinity develops from the testimony of Captain De Mars, called as an expert, who made measurements of the Monitor and the Inland. The tug's stem was approximately 35 feet astern of the stern of the barge, and it was made up so that the stern end of the tug was about even with the bow end of the barge. The Monitor was 81.5 feet long and the Inland about 116 feet long. The distance from the water line to the top of the pilot house was 13 feet, 11 inches. The distance from the water line to the forward end of the deck house of the barge was 12 feet, and the distance from the water line to the top of the pump engine house was 13 feet, 1 inch. Making allowances for some reasonable difference in the quantity of fuel and water on board at the time of the collision, and at the time that the measurements were taken by Captain De Mars, the inference persists that the structures at the stern of the barge obscured in measurable degree the visibility from Tarter's pilot house. This would account for Tarter's maneuver in swinging to port as he first saw the two staff lights over the structures at the stern of the Inland, and then awaiting an alarm signal. It appears also that Tarter was an unlicensed man and though he was not required to be a licensed man, yet that might indicate a lack of experience which must be considered. I may say in passing that the testimony given by the chief engineer of the Monitor did not help the Monitor's case and he was not convincing. Fault, which in itself would wholly account for the collision, clearly appears chargeable to the Monitor.

 I see no fault on the part of the Edward. She was the privileged vessel in a starboard hand situation, and there was no duty on her part to blow a passing signal. The Hoboken, 2 Cir., 59 F.2d 993; The Boston Socony, 2 Cir., 63 F.2d 246. As such privileged vessel in a starboard hand situation, it was her duty to keep her course and speed. 33 U.S.C.A. §§ 204, 206.

The Pfeifer Oil Transportation Company may have a decree against the tug Monitor,

but the libel as against the tug James Edward and the Essex Transportation Company will be dismissed. In the cross libel, the Essex Transportation Company, as owner of the tug James Edward, may have a decree against the tug Monitor.

Concurrently herewith findings of fact and conclusions of law will be filed.