## THE HAZELTON.

## THE ARLINGTON.

### (Circuit Court of Appeals, Second Circuit.   May 11, 1921.)

### Nos. 188, 189.

**1. Collision ⊂═⇒93—Ferryboat, after leaving slip, is bound by navigation rules.**

While ferryboats, while operating in or close by the entrances to their own slips, have rights somewhat superior to those of other craft in the immediate vicinity, such rights are no greater than reasonably required for their proper and efficient navigation, and they must maintain a sharp lookout for craft passing up and down the stream, and, once safely clear of their racks, are bound to navigate with respect to other craft in accordance with the rules of the road.

**2. Collision ⊂═⇒93—Ferryboat held in fault for collision with crossing tug.**

A collision between a ferryboat, leaving her New York slip to cross North River, and a tug, coming down 600 feet or more off the piers, and therefore the privileged vessel under the starboard hand rule, *held* due solely to the fault of the ferryboat in failing to sooner see the tug and to navigate accordingly. That another tug with a tow, passing down ahead and closer in, agreed by signal to allow the ferryboat to pass ahead did not require the outer tug to do the same, nor affect her rights or duty under the rule to keep her course and speed, nor was she in fault for failing to answer the ferryboat's signal, given when collision was imminent and probably inevitable.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by the Erie Railroad Company, owner of the ferryboat Arlington, against the steam tug Hazelton; the River & Harbor Transportation Company, claimant and cross-libelant. Decree dividing damages, and cross-libelant appeals. Reversed.

At about 8:50 a. m. of March 25, 1914, the ferryboat Arlington started to leave her slip at Chambers street, New York, bound for the Erie Railroad Terminal on the New Jersey side of the North River, and somewhat to the north of Chambers street. There was no wind, and the tide was high water slack. As the boat cast off she blew one blast of her whistle and started ahead full speed, but, as is usual, slowed down somewhat upon coming near to the end of the ferry rack and the open water of the stream. Then it was that the Arlington observed the steam tug Depew proceeding down the river, having in tow upon one side a derrick lighter, and on the other a covered barge.

The Depew was about 350 feet off the pier ends, and something like 250 feet to the north of the Arlington's course, which lay to the northwest. To the west of the Depew, and about abreast of her stern, the steam tug Hazelton was on her way from Hoboken to Pier 5, East River. The distance of the Hazelton from the pier ends is variously estimated at from 550 to 1500 feet.

The Arlington's whistle had been heard by the Depew, and, as the former emerged from the slip, the latter blew two blasts, thus indicating that the Arlington might cross the Depew's bow. The Arlington, by an answering signal of two blasts, agreed to the arrangement, and at full speed proceeded to put it into execution. In so doing the Arlington, for the first time, took note of the presence of the Hazelton. The master of the Arlington accounts for his succeeding movements as follows: " * * * I immediately blew

him two whistles. No reply. I blew him two more. No reply. I commenced to think that there must be something wrong, and I threw my helm to starboard, and I blew him two more. No reply; and when I threw the wheel hard astarboard I gave an extra jingle bell to the engineer. * * * As I blew the last two whistles, I was then coming across the course of the Hazelton. * * * I went to blow an alarm whistle, and my hand slipped from the cord, trying to throw the wheel at the same time. It didn't sound like an alarm whistle, but like two double toots. * * * " The master succeeded in putting his wheel hard aport, so as to throw the ferry's stern down stream and thus lessen the force of the then inevitable collision.

The Hazelton claims that as the ferryboat left her rack she angled up the river on her usual course, apparently intending to pass under the tug's stern, but that, as soon as the Arlington crossed the Depew's bow, she signaled the Hazelton and changed her course. The Hazelton maintains that upon hearing the Arlington's second signal of two blasts she stopped her engines, put them full speed astern, and hard astarboarded her wheel. This being done, two whistles were blown the Arlington.

The net result of the various maneuvers was that the Hazelton's bow swung to port and struck the Arlington a glancing blow upon her starboard quarter.

Cross-libels were filed in the court below and, coming on for trial, were consolidated. After hearing the evidence the court held both boats equally at fault and entered a decree in conformity therewith. The Hazelton appeals.

Barry, Wainwright, Thacher & Symmers, of New York City (James K. Symmers, of New York City, of counsel), for Erie R. Co..

Harrington, Bigham & Englar, of New York City (D. Roger Englar and Leonard J. Matteson, both of New York City, of counsel), for River & Harbor Transportation Co.

Before WARD and MANTON, Circuit Judges, and KNOX, District Judge.

KNOX, District Judge (after stating the facts as above). [1] In our opinion the entire blame for this collision should be borne by the Arlington. It is true that boats of her class, when operating in or close by the entrances to their own slips, have rights somewhat superior to those of other craft in the immediate vicinity. The Breakwater, 155 U. S. 252, 15 Sup. Ct. 99, 39 L. Ed. 139. These rights, however, are no greater than those reasonably required for the proper and efficient navigation of the privileged boats. Carroll v. City of New York, 249 Fed. 453, 161 C. C. A. 411. They must maintain a sharp lookout for craft passing up and down the stream, and, once safely clear of their racks, are bound to navigate with respect to other craft in accordance with the rules of the road. In this case there is no good reason why the Arlington should not have seen the Hazelton at the same time she observed the Depew. Neither that boat nor her tow obstructed the view from the Arlington. Her master frankly says there was "nothing to prevent" seeing the Hazelton, "I presume, but my attention being called to the exchanging whistles with the Depew and getting across his bow and looking at the distance for crossing his bow."

[2] The delay in seeing the Hazelton seems to us to account for all that transpired, and there can be no basis for holding the Hazelton liable, unless the District Court was justified in finding, as it did, that she was bound to hear the exchange of whistles between the Depew

and the ferryboat, and then to navigate in recognition of the rights of ferryboats in entering and leaving their slips. Assuming for the moment that the Hazelton was not, as claimed by the Arlington, more than 600 feet off the pier ends, she was, being the privileged boat, entitled to proceed, irrespective of the arrangements made between the Depew and the ferryboat.

The fact that the Depew was willing to, and did, give way to the Arlington was no cause for the Hazelton to do so. The Depew had a tow, the Hazelton was light, and, for all the latter knew, there might be good reason why the former did not care to proceed. The arrangement made as between the Depew and the Arlington did not curtail either the rights or obligations of the Hazelton. We accordingly hold that there was no duty upon the Hazelton to take note of, and to act in accordance with, the signals passing between the Depew and the Arlington.

The Hazelton, under the starboard hand rule, was bound to keep her course and speed, and, being at least 600 feet off the pier ends, could not with propriety depart from the obligation resting upon her prior to the time that the Arlington blew her the first signal of two blasts. Until that moment, at least, the Hazelton believed that the Arlington would navigate so as to pass under her stern. The ferryboat says this would have been impossible; but, in view of all the testimony as to the distance of the Hazelton from the pier ends, we are unable to say that such was the fact.

The signals from the Arlington, once the Hazelton was observed, followed in quick succession, and, even if it be assumed that the Hazelton should have stopped and reversed her engines at the first of such signals, it is by no means clear that the collision would then have been avoided. The master of the Arlington, in imputing fault to the Hazelton, suggests that she should have navigated as follows:

"If he had answered my first whistle according to law by an alarm whistle and throwed his wheel aport, that would have given me an opportunity to stop, and he would have went on ahead; but he would have had to alter his course to do it."

This, in our opinion, is but another way of saying that the Arlington, through her own fault, having placed the Hazelton in an emergency, primarily relied upon her to extricate both vessels from their perilous position. This being so, the conduct of the Hazelton, when placed in extremis, is not properly the subject of that degree of censure upon which her liability can be predicated. In this respect this case is not unlike that of The Haida (D. C.) 191 Fed. 623, wherein it was held that, when the burdened vessel is grossly at fault, the law puts upon her the burden of showing clearly that the other was at fault. Such burden has not been borne by the Arlington. We are not convinced that the Hazelton's failure to change her course and speed, upon receiving the first signal given her by the Arlington, and to then answer the Arlington's signal, made any real contribution to the collision. The second signal, at which the engines were stopped and reversed, followed immediately after the first; and having regard for that interval of time, almost instantaneous though it be, wherein a person must com-

prehend a condition and determine upon his course of action, we are unwilling to hold that the Hazelton's action, or lack thereof, was of such character as to merit condemnation.

For the reasons specified, we hold the Arlington alone at fault, and reverse the decree below.