### THE HOBOKEN.

**PENNSYLVANIA R. CO. v. DELAWARE L. & W. R. CO.**

### The PHILADELPHIA.

**DELAWARE, L. & W. R. CO. v. PENNSYLVANIA R. CO.**

### Nos. 371, 372.

Circuit Court of Appeals, Second Circuit.
June 20, 1932.

994

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Paul Tison, both of New York City, of counsel), for appellants Pennsylvania R. R. Co. and the Ferryboat Philadelphia.

John E. Morrissey, of New York City, for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

At about 4:30 p. m. on the afternoon of August 26, 1927, the ferryboat Philadelphia, owned by the Pennsylvania Railroad Company, left her berth at Desbrosses street, Manhattan, on her regular trip to Jersey City. Though the weather was cloudy, the visibility was good. The tide was flood, and the wind northeast. When she was settled on her course, which was on a curve to her port hand to the point of collision, an Erie ferryboat from Pavonia, Jersey City, was bound for Chambers street, New York. Just before the collision, the tug Stroudsburg of the Delaware, Lackawanna & Western Railroad Company, bound up the river with two floats in tow, one on each side, was about midstream off Cortlandt street, New York. The tug Hoboken of the same company with a float on her starboard side was also then bound up stream some four hundred feet behind and to port of the Stroudsburg. This placed the Hoboken nearer than the Stroudsburg to the Jersey shore. Just ahead to port of the Hoboken and some 300 feet nearer the Jersey shore was the tug Baker Brothers, bound up stream with a hawser tow of two scows tandem. The tug Bath of the Delaware, Lackawanna & Western Railroad Company with a

float in tow on each side was bound down stream on a course between the Stroudsburg and the Hoboken. And somewhat farther down stream than any of the vessels already mentioned was a ferryboat of the Central Railroad of New Jersey bound from Twenty-Third street, New York, to Jersey City. It should be noticed that the Philadelphia and the Hoboken were on crossing courses with the Philadelphia, the holding-on vessel. At the same time the Philadelphia and the Erie ferryboat were on crossing courses with the Philadelphia, the burdened vessel. The Stroudsburg was the burdened vessel as to the Philadelphia, but nothing it did, or that was done because of it, can be said to have affected the collision. The Bath was crossing the course of the Philadelphia on the latter's starboard hand to make the Philadelphia the burdened vessel of the two.

The trial judge held that the situation presented a case of special circumstances. It must be said at once that the boats in the vicinity were so numerous that duties imposed upon them by the rules may, at first, seem so conflicting that the special circumstance rule alone would apply. Yet we think upon analysis of the situation that this seems so only if faults of both the Hoboken and the Philadelphia which brought them negligently into close quarters are overlooked. The Philadelphia, without any signal, crossed the bow of the Bath so closely that that vessel blew an alarm, stopped her engines, and backed to avoid a collision. Having so gained a position which took her about fifty feet under the stern of the Erie ferryboat, she found herself, as she came out, only about two hundred feet ahead of the Hoboken and across her course. Then the Philadelphia gave a one-whistle signal to the Hoboken and increased her speed under a hard astarboard helm in an effort to keep her stern from the Hoboken and at the same time clear the tug Baker Brothers. The Hoboken answered the Philadelphia's one-whistle signal with an alarm, put her engines full speed astern, but was unable to hold back enough to prevent the collision. The bow of the Hoboken's car float and the port side of the Philadelphia at a point about sixty feet from the stern came together. The collision was nearly in midstream off Pier K, Jersey City. About the time the Philadelphia went under the stern of the Erie ferryboat, that vessel blew a two-blast signal to the Hoboken. This was answered with two blasts, and the Hoboken starboarded her helm to change her course about four points to port to assure a safe

port to port passing with the Erie ferryboat. This made her position as the burdened vessel with respect to the Philadelphia still more dangerous.

 Instead of holding back for the Bath as she easily could, and under the starboard hand rule should have done, the Philadelphia violated that rule in keeping right on across the bow of that vessel. No doubt the Hoboken had the right to navigate on the assumption that the Philadelphia would go under the stern of the Bath until it became apparent that she would not do that. By crossing ahead of the Bath, unexpectedly the Philadelphia came up to go under the stern of the Erie ferryboat sooner than she would have had she performed her duty toward the Bath, and so the course and speed the Hoboken had the right to expect of the Philadelphia was materially changed to bring her more quickly across the course of the Hoboken to the embarrassment of that boat. Even so, the Hoboken might have avoided the collision had she, when she saw, or should have seen, that the Philadelphia had violated the rule and pushed ahead of the Bath, simply held back upon the assumption that the Philadelphia would go under the stern of the Erie ferryboat and come out without change of course across the bow of the Hoboken. Instead of holding back for the Philadelphia, the Hoboken came right on in the belief, as the evidence puts it, that the Philadelphia would turn from her course and follow the Erie ferryboat back toward the Brooklyn shore. This seems to us to have been a wholly unwarranted conclusion. At that time the course and speed of the Philadelphia relative to the Hoboken had been established even though wrongfully so because of her breach of duty toward the Bath, and in violation of her duty to maintain her apparent course and speed for the benefit of the Hoboken. In short, what brought about this collision was the combined faults of both colliding vessels. The Philadelphia first failed to give way to the Bath, and by so doing changed her apparent course and speed, which made it necessary for the Hoboken to give way to the Philadelphia by acting sooner than was to be expected. Yet she failed to act at all until a time when nothing she could do would avail, because she jumped to the erroneous conclusion that the Philadelphia would keep out of her way by turning back toward Brooklyn in the wake of the Erie ferryboat. In all this, it should not be forgotten that the Philadelphia was on a curving course, but even so her apparent course was as plain as though it had been straight, and what counts is the means afforded the burdened vessel to determine where the privileged vessel will be as time passes and so be able to act intelligently to keep out of her way. The Napoli (D. C.) 12 F.(2d) 130; The Hallgrim (C. C. A.) 20 F.(2d) 720; Commonwealth & Dominion Line v. United States (C. C. A.) 20 F.(2d) 729. No fault can be attributed to the Philadelphia for giving no signal to the Hoboken while the Philadelphia maintained what was her apparent course and speed, for the Hoboken's duty was to keep out of her way without receiving any signal, since the Philadelphia was in plain sight. Though her future position relative to time was changed and her fault gave the Hoboken less time than she had had the right to count on in maneuvering to keep out of the way, she still remained the privileged vessel, and the Hoboken certainly had no right to expect her to change her course something like 90 degrees to port to follow the Erie ferryboat out of all danger of collision. Her course was obviously under the stern of the Erie boat without any change in direction, and that is what she took. The Hoboken must be held at fault for violating the starboard hand rule in not holding back out of the way. The Cranford (C. C. A.) 27 F.(2d) 710; The St. Louis (D. C.) 35 F.(2d) 741, affirmed without opinion (C. C. A.) 35 F.(2d) 742. These two faults caused the collision.

I have said nothing about the tug Baker Brothers except to indicate its position. It did, indeed, produce an additional hazard to the navigation which brought about the collision which the faults already pointed out had made inevitable, but there seems to be no necessity for discussing that.

Decrees modified to hold both vessels at fault.