63 F.2d 246 (1933)
THE BOSTON SOCONY.
PENNSYLVANIA R. CO.
v.
STANDARD TRANSP. CO.
THE P. R. R. NO. II.
STANDARD TRANSP. CO.
v.
PENNSYLVANIA R. CO.
Nos. 99, 100.
Circuit Court of Appeals, Second Circuit.
February 14, 1933.
Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark, of New York City, of counsel), for appellant.
Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for appellee.
Before L. HAND, SWAN, and CHASE, Circuit Judges.
SWAN, Circuit Judge.
Before daylight on March 8, 1928, a collision occurred in the East River between the motor vessel Boston Socony, owned by Standard Transportation Company, and a car float in tow of the tug P. R. R. No. 11, owned by the Pennsylvania Railroad Company. Each owner filed a libel against the vessel of the other. The cases were tried together, and resulted in a finding that the Pennsylvani's tug was solely at fault. Accordingly, a final decree of dismissal was entered in the suit brought by the Pennsylvania Railroad Company, and an interlocutory decree for damages was awarded Standard Transportation Company in its libel.
The tug No. 11, with two carfloats in tow, one on each side, was proceeding up the easterly channel of the East River against an ebb *247 tide. The collision occurred close to the bell buoy to the southward of Belmont Island and at the extreme westerly side of the channel, which is some 1,200 or 1,300 feet wide at this point. The No. 11 seeks to justify her position on the westerly side of the channel by the claim that she was keeping clear of the turning maneuver of a Long Island tug and car float. As she approached the Long Island Railroad terminal at Long Island City, she observed this flotilla about to back out into the river. The Long Island tug sounded a slip whistle, followed by a two-blast signal to the No. 11, which the latter answered with two blasts, starboarding her helm and going slow ahead under one bell. The Long Island tug backed out, made a complete turn of her carfloat, headed down stream, and passed tug No. 11 starboard to starboard in accordance with their agreed signals. In making this maneuver, the Long Island tug did not get further out into the river than 600 feet from the pier ends. The District Court found that there was plenty of room for the No. 11 to pass the Long Island flotilla without having gone so far to the westward, and that she got into that position as a result of a decided sheer to port after her exchange of whistles with the Long Island tug.
The Boston Socony left her berth at De Voe's Dock on the east side of the river at Eleventh street shortly before the Long Island tug sounded its slip whistle. As she lay at the pier, she was headed down stream. On conflicting testimony, the District Court found that upon getting under way she immediately headed straight for the Belmont Island bell buoy; her intention being to round the buoy and proceed up the west channel. The Socony and the No. 11 claim to have had each other under observation at least from the time when the Long Island tug gave her two-blast signal to the No. 11. Although the Socony saw the tug No. 11 converging toward the bell buoy, she kept her course and speed; her master considering that he had the right of way and that the No. 11 would change her heading and pass to port of the Socony. No signal was given by either vessel until just prior to collision, when each sounded an alarm and reversed. The collision could not then be averted; the stem of the Socony struck the starboard float of the tug No. 11 about 10 or 15 feet from its forward end and at an angle of about 45 degrees. All the witnesses place the collision within 150 feet and southeasterly of the bell buoy.
Upon this appeal the issue chiefly disputed is whether the navigation of the vessels was governed by the rule of special circumstances or by the starboard hand rule. Articles 27 and 19, respectively, of the Inland Rules (33 USCA §§ 212, 204). The appellant contends for the former; the appellee for the latter.
In determining this question, the crucial fact is the District Court's finding that the Socony headed for the Belmont Island bell buoy immediately after leaving her pier. Not only the testimony of her witnesses but all the probabilities support this finding. There is no reason why she should have gone down stream and then ported across. The straight course was shorter and the ebb tide was favoring; she would naturally get into its strength at once. Heading for the buoy would put her course diagonally across the channel and expose her red light to the tug No. 11. The latter's story that only the green light of the Socony was first seen, and then later it was suddenly shut off and the red light brought into view, was very naturally discredited by the trial judge. But, even if we thought otherwise, we should yield to his finding, for he had the advantage of seeing the witnesses.
Once it is established that the Socony made straight for the buoy, it is clear that the starboard hand rule applied. She was on a steady course, for she was obviously crossing the channel, as she had the right to do. The Dixie, 57 F.(2d) 184 (C. C. A. 2); The Hoboken, 59 F.(2d) 993 (C. C. A. 2); The Breakwater v. New York, L. E. & W. R. Co., 155 U. S. 263, 15 S. Ct. 99, 39 L. Ed. 139. That she intended to turn at the buoy is wholly immaterial; it cannot be successfully maintained that she was merely maneuvering while she was holding a steady heading over the half-mile distance between her pier and the buoy. The No. 11 was also on a steady course. While the backing out of the Long Island flotilla hampered her navigation, it did not change the fact that she was on a steady course with respect to the Socony; that is, her apparent purpose remained the same, namely, to proceed up stream in the easterly channel. When the Long Island tug gave its two-blast signal, the No. 11 had already sighted the Socony farther up the river, and was chargeable with her presence on a course headed for the bell buoy. Under article 19 she was bound to keep out of the way. Two courses were open to her. She could wait  the tide was against her  or she could starboard, as she did, so as to give clearance to the Long Island flotilla. The latter course demanded that she be able to port again in time to clear the Socony, which had the right *248 of way. If this was dangerous, she should have stopped where she was, or have gone to port and then stopped, or have blown an alarm to the Long Island tug. But she cannot excuse her navigation with respect to the Socony by going too far to port and crossing the latter's course in order to avoid the Long Island flotilla. The Hoboken, supra. The No. 11 was clearly at fault.
There remains the question whether the Socony was properly excused from fault. It is urged that she should have stopped sooner. The privileged vessel is always in a difficult situation. The rule is that she must keep her course and speed until it becomes apparent that the burdened vessel cannot alone avoid the collision. 33 USCA § 206; The Delaware, 161 U. S. 459, 16 S. Ct. 516, 40 L. Ed. 771; Wilson v. Pacific S. S. Co., 276 U. S. 454, 462, 48 S. Ct. 369, 72 L. Ed. 651. It is impossible to know exactly when it became apparent that the No. 11 could not, or would not, port or stop. We do not think it was proved that that time had come before the master of the Socony acted.
It is further urged that the Socony should have sounded a passing signal to the No. 11. Being the privileged vessel, she was under no such duty. The Hoboken, 59 F.(2d) 993, 995 (C. C. A. 2). Rule 3 of the Supervising Inspectors Rules is relied upon as imposing a duty to signal; but in our opinion that rule cannot be construed as applying to vessels on crossing courses. Whether it would be valid if it were so construed, we need not say. Compare The Fulton, 54 F.(2d) 467 (C. C. A. 2).
The complaint as to the Socony's lookout is without merit.
Decrees affirmed.