### PITNEY et al. v. UNITED STATES.
### THE WESTFIELD.
### No. 350.

Circuit Court of Appeals, Second Circuit.

June 15, 1945.

---

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for libellants-appellees.

T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y. (Vincent A. Catoggio, Sp. Asst. to U. S. Atty., of New York City, of counsel), for respondent-appellant.

Before SWAN, CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The libellant's ferryboat Westfield left her terminal at Communipaw, N. J., about 9 o'clock on the morning of March 6, 1943, to make her usual run to her slip at Liberty Street on the Manhattan shore of the North River. The visibility was fair. When she had moved on a flood tide on a course a little north of east to a point some three thousand feet off the New York side of the river and while she was making about ten miles an hour her master saw the libelee's steamlighter Admiral Villiers, a public vessel of the United States manned by a navy crew, coming up the river to starboard but so far away that he thought the Villiers was going to pass under the Westfield's stern. The tug Diamond S was also coming up slightly behind the Villiers but the Westfield's master paid scant attention to them and blew no signal. A little later he stopped his engines and let the Westfield drift toward shore while another ferryboat, the Newark, was entering a rack in the same slip the Westfield was to enter. When the Westfield had drifted about three lengths, some 600 feet, her master noticed that the Villiers was keeping her course and speed and that there would be a collision unless something was done. He then blew a two blast signal "more to attract his attention that we were there than as a crossing whistle, because I assumed, under the circumstances, that it was not necessary to blow a crossing whistle." The Villiers answered with two blasts which the Westfield's master did not hear and when she was about 250 feet away reversed her engines and went hard left. The Westfield blew an alarm, reversed her engines, and stopped about half her length across the bow of the Villiers which hit her just aft of amidships, and did some damage. The Villiers was unharmed. When the Westfield stopped she was out in the river from 900 to 1000 feet off the pier-head line. The trial judge decided that the starboard hand rule did not apply but that it was a case of special circumstances and held the Villiers solely at fault. Her owner has appealed.

We think it was error to hold that the starboard hand rule was inapplicable at a point so far off the pier-head as that where this collision occurred. Though ferryboats do have special privileges when navigating close to the entrances of their own slips, The Breakwater, 155 U.S. 252, 15 S.Ct. 99, 39 L.Ed. 139, those are no greater than are reasonably required for safe and efficient navigation. The Hazelton, 2 Cir., 273 F. 815. A ferryboat in the North River some five or six hundred feet off her slip has been held bound to navigate in compliance with the starboard hand rule, The Red Star Towing & T. Co. v. Director General of R. R., 2 Cir., 292 F. 854, and we think that rule should have been given effect in this situation. The Westfield as the burdened vessel should have kept out of the way of the Villiers while that vessel held its course and speed. Arts. 19 and 21, of the Inland Rules, 33 U.S.C.A. §§ 204, 206. The failure of the Westfield to do so was a fault for which she must be held responsible.

The remaining question is whether the Villiers was also at fault. As the privileged vessel she was under no duty to signal the Westfield in a crossing situation. The Boston Socony, 2 Cir., 63 F.2d 246; The Hoboken, 2 Cir., 59 F.2d 993, but merely to keep her course and speed to enable the burdened vessel to navigate accordingly and thereby keep out of the way. But this is not, of course, either a duty or a privilege to keep on into collision and, when it is apparent that the burdened vessel is not performing her duty to keep out of the way, the privileged vessel must navigate as prudence dictates to avoid collision if possible. But as was pointed out in the Socony case just mentioned the privileged vessel is in a difficult situation when she must decide whether or not to hold her course and speed. If she does make a change she must do so at the risk of being held at fault for so doing if her attempt to avoid collision is not successful and should not be held bound to take that risk except in cases where it is clearly proved that she knew, or should have known, that the burdened vessel either would not or could not avoid collision by her own effort.

In this instance the trial judge found on sufficient evidence that, "The Admiral Villiers, had she navigated in com-

pliance with the two-whistle signal, would have passed under the stern of the Westfield, and gone up the North River," and that, "The Westfield, being with her engines stopped, drifting to enter the slip, could not have escaped the collision by going forward or astern after the giving and acceptance of the two-whistle signal." Though the acceptance of that signal did not affect the navigation of the Westfield since her master was unaware of it and it did not, of course, excuse her fault, it was nevertheless an abandonment by the Villiers of her position as the privileged vessel and it then became her duty to co-operate in the new situation by taking timely action to change her course and speed so as to pass safely under the stern of the Westfield. The Newburgh, 2 Cir., 273 F. 436. Her belated attempt so to do was a fault which contributed to cause the collision and for that she must be held for half damages.

Decree modified. No costs.