## THE YOUNGSTOWN.
## THE INVADER.
### No. 17189.

District Court, E. D. New York.
March 19, 1946.

Hagen & Eidenbach, of New York City (Charles W. Hagen, Nelson J. Johnson, and David A. Kraemer, all of New York City, of counsel), for libellant.

Duncan & Mount, of New York City (Henry W. Dieck and W. H. Hecht, both of New York City, of counsel), for claimant.

INCH, District Judge.

This suit arises from a collision in the North River in the early morning of February 27, 1944, at the entrance of the ferry slip between Piers 19 and 20 on the Manhattan side, between the Erie ferryboat Youngstown, owned by libellant, Erie Railroad Company, and one of the heavily loaded carfloats in tow of the tug Invader, owned by Havemeyers & Elder, Inc.

The tug Invader had two carfloats in tow, one on each side of the tug, the port float projecting about 150 feet beyond the stem of the tug, the other float was shorter. The ferryboat hit the port corner of this port float as the ferryboat entered the slip. This was due to the fact that just before the contact the Invader had been backing, which swung in somewhat his floats towards the Manhattan piers.

It was around six o'clock in the morning, there was a northeast wind blowing, with rain, visibility was low, and the tide was running strong ebb. The ferryboat had been coming on a somewhat diagonal course with the tide, towards her slip. The Invader had come around the Battery and was bucking the ebb tide, with her heavy floats, making about 3 or 4 knots. The ferryboat was "hooked-up."

At the trial, it was shown that the captain of the ferryboat, who had been directing the navigation of it, had died a year and one-half ago, but it was also shown that he had been a captain of the ferryboat, in the employ of the Erie Railroad Company, for approximately twenty-six years. In his place libellant put on the stand, Futterer, who was in the pilot house of the ferryboat at the time, acting as wheelsman and lookout. Futterer had twenty years experience. The captain of the tug Invader, Brusich, had a license for twenty-four years and he had been in the employ of the Erie Railroad Company about nine years ago, but at the time of the accident, he was employed by the owner of the tug having been about eight years in the employ of the Brooklyn Eastern District Terminal.

As usual the ferryboat blames the collision entirely .on the navigation of the tug

while the tug claims it was due entirely to the fault of those in charge of the ferryboat.

While it is sometimes difficult to find definitely, in a collision of this sort, a fault of navigators, it does seem to me the cause of the accident in this case is apparent beyond a mere probability, for the reason that many of the material facts are not really in dispute, the court having advantage of the testimony of apparently disinterested witnesses, such as Drago, the captain of a Central tug, Fultz, captain of a B & O tug, and Olson, captain of the tug Socony Vacuum, all of whom were eye witnesses of much that occurred prior to the actual collision.

At the outset it should be stated that this court believes this is a Starboard Hand Rule case. The Boston, 2 Cir., 277 F. 36; Red Star Towing, etc., v. Director, etc., 2 Cir., 292 F. 854; Pitney v. United States, 2 Cir., 149 F.2d 907; The Boston Socony, 2 Cir., 63 F.2d 246.

I do not think that this is a case, as argued by counsel for libellant, of special circumstances. The Boston Socony, supra. Special circumstances are the exception. Northern Transportation Co. v. Davis, 2 Cir., 282 F. 209–211.

The river is about 3000 feet wide in the locality of this collision and when the ferryboat had reached about the middle of the North River and had followed its usual course, on the ebb tide, which was to go up somewhat from the Jersey City side and then approach, on a diagonal course with the ebb tide, its ferry slip between Piers 19 and 20 on the Manhattan side. When it was about in the middle of the stream the New York Central tug with carfloats was coming up. Drago was the captain of this tug. The ferryboat blew a two whistle signal to the Central which was accepted by the Central. The ferryboat slowed down somewhat and the Central slowed and went somewhat to port so that this crossing was safely and properly made. When this crossing had about been completed it was discovered by the ferryboat that the Invader was also coming up on the Manhattan side with her heavy carfloats, to the rear of the Central, but about 500 feet to the east.

I shall assume that the Invader was not seen by the ferryboat until that time and that the Invader did not see the ferryboat until that time. The Invader may have heard the crossing signals of the ferryboat to the Central, but this did not require the Invader to interfere by blowing signals. The Hazelton, 2 Cir., 273 F. 815.

However, as soon as the captain of the ferryboat saw the Invader and her floats bucking the ebb tide, he seemed determined not to let anything stand in the way of his fixed purpose to get into the slip notwithstanding this obstacle. He thereupon "hooked-up" with the tide under foot, and blew a two whistle signal to the Invader. The Invader seeing the danger blew an alarm whereupon the ferryboat again insisted on having her way by blowing another two whistle blast. By this time the danger was so apparent that the Invader again blew an alarm and backing signal and endeavored to get out of the way. This backing of the Invader turned her floats somewhat towards the Manhattan side whereupon the ferryboat, determined on its course, attempted to squeeze into its slip bringing the side of the ferryboat against the port corner of the port float of the Invader, causing considerable damage to the ferryboat as she proceeded into her slip.

It seems to me that this collision could have been entirely avoided had the ferryboat, being the burdened vessel, used a little care in following the Starboard Hand Rule.

There is some controversy as to the location of the Invader and her floats when the ferryboat blew her first two whistle signal. As I have said I prefer to take the testimony of several disinterested witnesses as to this. Drago, of the Central, looked around when he heard the danger signal of the Invader and it is his opinion that the Invader was then about Pier 19.

Fultz was on his tug at the end of Pier 25, and his estimate is that the Invader and her floats were about 300 feet off the Chambers Street ferry slip, which is between Piers 19 and 20.

Olson, who was on his tug at the end of Pier 18, says that the Invader, when he

heard her give the alarm, was about even with Pier 18, where Olson was standing, and the bow of one of the carfloats of the Invader was about even with the lower end of Pier 19.

I am satisfied, therefore, the Invader and her floats were very near to Piers 19 and 20, the entrance to the ferry slip. As she was the privileged vessel it was her duty to keep her speed and course. All the ferryboat had to do was to cut down on her speed, abandon her determination to get in between the piers · and the Invader and her floats and the result would have been no collision. In other words, obey the Starboard Hand Rule. The subsequent backing of the Invader cannot be ascribed to a fault and very possibly did diminish the damage which might otherwise have occurred. This case is somewhat similar to a case cited by claimant. The Hazelton, 2 Cir., 273 F. 815, already mentioned above.

As I find the ferryboat was solely at fault, the libel must be dismissed. ·

Submit findings and decree.