ERIE R. CO. v. THE INVADER et al.
THE YOUNGSTOWN.

No. 156, Docket 20444.

Circuit Court of Appeals, Second Circuit.

Feb. 3, 1947.

Hagen & Eidenbach, of New York City (Charles W. Hagen and Nelson J. Johnson, both of New York City, of counsel), for appellant.

Duncan & Mount, of New York City (Henry W. Dieck and Wilbur H. Hecht, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This litigation arises out of a collision between the ferryboat Youngstown, owned by appellant, and a loaded carfloat in tow of the tug Invader, owned by appellee. The collision occurred at the entrance to appellant's ferry slip between piers 19 and 20 on the Manhattan side of the North River near Chambers Street. Applying the starboard hand rule,[1] the trial judge found the Youngstown solely at fault. From the decree of dismissal the libellant appeals, contending that the case was one of special circumstances[2] and the Invader solely at fault.

---

[1] 33 U.S.C.A. § 204.

[2] 33 U.S.C.A. § 212.

There is no substantial dispute as to the facts. At 5:50 A.M. on February 27, 1944, the Erie ferryboat Youngstown left her rack at Pavonia Avenue, Jersey City, on her regular run to New York. The wind was from the northeast with rain, visibility was low, and the ebb tide was at its strength. When the ferry was near midriver and heading for her Chambers Street slip on a diagonal course down and across the river, she saw the red light of the New York Central tug No. 15, which was upbound with two carfloats in tow. The No. 15 was off pier 22 and about 800 feet out in the river. The ferry sounded a two whistle signal to the No. 15 which immediately answered with two, stopped her engines and turned somewhat to port to facilitate the crossing of her bows by the Youngstown. At the time these signals were exchanged the tug Invader with a carfloat on either side was proceeding up the river somewhat astern of the No. 15 and about 300 feet off the Manhattan pier ends. The positions of the vessels were such that the Youngstown could not see the Invader, nor the Invader see the Youngstown, until the latter emerged beyond the bows of the floats in the tow of the No. 15. The Invader, however, heard the signal blown to the No. 15, recognized the whistle as that of an Erie ferry, and knew that she was to cross ahead of No. 15 and make for her slip at Chambers Street. Nevertheless, the Invader continued ahead with undiminished speed and without change of course. When the master of the Youngstown caught sight of the Invader he blew her two whistles, which she answered with an alarm. According to the testimony of Olson, a disinterested witness and the one in best position to observe the Invader's position, the tug was then about even with pier 18 and the bow of one of her carfloats was about even with the lower end of pier 19. The Youngstown repeated her crossing signal and continued ahead at full speed. The Invader again blew an alarm and reversed her engines, sounding backing whistles. Her backing turned her carfloats somewhat in toward the piers. The Youngstown kept on and attempted to squeeze into her slip, but her starboard side amidships came into collision with the port corner of the port carfloat which extended about 150 feet beyond the tug's stem. The bow of the ferry was about 100 to 125 feet from her slip when the collision occurred.

The trial judge found that the collision could have been avoided had the ferry which was the burdened vessel, observed the starboard hand rule. Because her master, who had died before the trial, insisted on pressing on in order to enter the slip with the tide and thereby avoid passing under the stern of the Invader, which would have required him to land against the tide, the Youngstown was held solely at fault.

In holding that this was a starboard hand situation, we think the district court was in error. The duty of the Invader to navigate with respect to the Youngstown began before the latter came into view beyond the bows of No. 15's carfloats. By the exchange of signals between the ferry and No. 15 the Invader knew of her approach and knew that she was bound for her Chambers Street slip. It was not, however, a situation where the starboard hand rule applied because that rule presupposes that both vessels shall be in sight of each other and can continually check each other's positions. Lind v. United States, 2 Cir., 156 F.2d 231, 233. It was a "special circumstance" situation. Consequently the Invader was not privileged to hold her course and speed, knowing that by so doing her course and that of the ferry would cross, and that the latter could not, until she emerged from behind No. 15's tow, anticipate her presence. Under such circumstances careful navigation required the Invader to hold back or to move over under a left rudder away from the pier ends. Either was perfectly easy to do; she was bucking a strong ebb tide and there was nothing to hinder her going over behind No. 15, which was ahead and 500 feet to the west. Although the trial court made no finding as to the position of the Invader when the Youngstown and No. 15 exchanged signals, it is obvious that she must have been several hundred feet below pier 18, for she was admittedly making 3½ miles an hour over the ground and the time taken by the ferry after the exchange of whistles to pass from mid-river to beyond the bows

650

of No. 15's tow must have been at least one minute. The Invader was at fault for pressing on after hearing the exchange of signals between the ferry and No. 15.

It is urged by the appellee that this court's decision in The Hazelton, 2 Cir., 273 F. 815, shows that the Invader was under no duty to hold back or sheer to port when she heard the exchange of signals between the Youngstown and No. 15. That case involved a collision between the ferryboat Arlington and the tug Hazelton. When the Arlington left her slip at Chambers Street bound for the New Jersey side of the river, the tug Depew with a tow made fast on each side, was proceeding down the river about 250 feet off the pier ends and some 250 feet to the north of the Arlington's course. About abreast of the Depew's stern and not more than 600 feet off the pier ends the Hazelton was coming down, light. The Depew and the Arlington exchanged signals permitting the ferry to cross the Depew's bow. In executing this maneuver, the ferry for the first time noticed the presence of the Hazelton and signaled for leave to cross her bow. · The latter claimed to have immediately put her engines full speed astern, but collision was not avoided. The district court held the vessels equally at fault. On appeal the decree was modified to hold the Arlington alone, but as the opinion states (273 F. at page 816), this was because "The delay in seeing the Hazelton seems to us to account for [everything] that transpired * * *." It is true that the opinion says that "there was no duty upon the Hazelton to take note of, and to act in accordance with, the signals passing between the Depew and the Arlington" and that under the starboard hand rule the Hazelton was bound to keep her course and speed until the Arlington blew her a two blast signal. But this is because the vessels were in plain sight of each other, so that the starboard hand rule was applicable. The case is not an authority for applying it in a situation such as that at bar, where the supposedly privileged vessel knows that the burdened vessel is unaware of her presence and that pressing on will make more difficult the latter's navigation when the vessels catch sight of each other.

The Youngstown, however, should not be exonerated. As soon as she caught sight of the tow she realized that the situation was dangerous for she claims to have sounded an alarm just before blowing two whistles to the Invader. The disinterested witness Fultz, who was at the end of pier 25, says the ferry was then between piers 25 and 23 and about 600 or 650 feet out in the river. If so, she must have been more than 1200 feet away from the up-coming tow. Although the present master of the Youngstown testified in response to hypothetical questions that she did not have room to turn to starboard and pass down between the No. 15 and the Invader, the trial judge was not persuaded that this was impossible; nor are we. We accept the finding that she was determined to hold her course in order to avoid having to make her slip against the ebb tide. Each vessel was obstinate and stubborn in trying to force her own way; both should be held responsible. The judgment is modified in accordance with the foregoing opinion, with costs awarded to the appellant.