237 F.2d 884
 Matter of The Petition of Charles Francis ADAMS et al., as Massachusetts Trustees of Eastern Gas & Fuel Associates, and, as such Trustees, Owners of THE MELROSE, for exoneration from or limitation of liability, Petitioners-Appellants.
Charles Francis ADAMS et al., as Massachusetts Trustees of Eastern Gas & Fuel Associates, and, as such Trustees, Owners of The Melrose, Libelants-Appellants,
v.
CONSTRUCTION AGGREGATES CORPORATION, Respondent-Appellee.
THE SANDCRAFT.
 No. 307.
 Docket 24006.
 United States Court of Appeals Second Circuit.
 Argued April 10, 1956.
 Decided October 3, 1956.
 Rehearing Denied November 7, 1956.
 Writ of Certiorari Denied January 14, 1957.
 
 See 77 S.Ct. 364.
 Robert S. Erskine, New York City (Kirlin Campbell & Keating and John F. Gerity, Eugene F. Gilligan, and David P. Dawson, New York City, of counsel), for Adams et al., owners of The Melrose, libellant-appellant-appellee.
 Leonard J. Matteson, New York City (Bigham, Englar, Jones & Houston and Hagen & Eidenbach, New York City, Richard F. Shaw and Donald M. Waesche, Jr., New York City, of counsel), for Construction Aggregates, owner of The Sandcraft, respondent-appellee-cross-appellant.
 Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.
 HINCKS, Circuit Judge.
 
 
 1
 Two steamships, the Sandcraft, a 265 foot sand dredge owned by Construction Aggregates Corporation, and the Melrose, a 444 foot liberty type freighter owned by Charles Francis Adams et al. as Trustees, came into collision in clear weather, at night, July 2, 1950, in New York Harbor. The owners of both vessels petitioned for a limitation of liability and these petitions were consolidated with a libel brought by the owners of the Melrose and a cross libel filed by the owners of the Sandcraft. From a decree holding both vessels at fault and dividing the damages, both parties appeal. The findings and opinion below are reported in 125 F.Supp. 110.
 
 
 2
 The east coast or harbor side of Staten Island is lined with piers. Intervening between Staten Island and the fairway is an anchorage area upwards of a thousand yards wide. It is conceded that the Narrow Channel Rule is applicable to the fairway. The Sandcraft had proceeded through the Kill Van Kull, north of Staten Island, turned right outward bound down the harbor on a 2-knot ebb tide. Shortly after this change of course, allegedly to avoid a ship coming in to anchor, the Sandcraft bore to its right, entered the Staten Island anchorage area and continued south within it for about a mile until a tanker, anchored in the anchorage area close by the fairway, blocked its course. The Sandcraft then turned left to avoid the tanker the bow of which it cleared by only 10 feet. In so doing it gave a two-blast signal and entered the fairway with engines full speed ahead. At this point, Sandcraft's green light was sighted by the Melrose, which was proceeding inward bound on her right side of the channel. To throw its stern clear of the tanker the Sandcraft turned right, down channel, thereby exposing both lights to the Melrose which, not having heard any prior signal and assuming that a port to port passing was in order, gave a one-blast signal. The Sandcraft responded with a two-blast whistle and turned left, across the fairway, blocking out its red light. The Melrose immediately reduced speed to slow ahead. The Sandcraft then, rather than continuing on a port wheel until headed in an up-channel direction, levelled out on a course across the channel towards Brooklyn. When about 100 feet away, with the collision imminent, the Melrose gave a danger signal and reversed engines; but to no avail. Its bow struck the Sandcraft in the starboard stern quarter: Sandcraft sank within ten minutes. The entire episode, from the time when Sandcraft was first sighted entering the fairway above the tanker's bow until the collision, was compressed into approximately two minutes.
 
 
 3
 Judge Murphy found that both ships were at fault: the Sandcraft for delaying departure from the anchorage grounds and failing to continue its port wheel after her two-blast signal, and the Melrose for failing to reverse and sound a danger signal immediately upon hearing the Sandcraft's two-blast signal.
 
 
 4
 There can be no doubt that the Sandcraft's conduct was negligent and that its negligence was a substantial and indeed the major cause of the collision. So obvious was her fault that we think it unnecessary even to discuss the effort made by her counsel to isolate and then justify each successive phase of her conduct. Necessarily, prior phases contributed to the effect of successive phases and it would be fruitless to consider whether any single phase of its conduct, in isolation, constituted a proximate cause. We hold Judge Murphy's finding that the Sandcraft's faulty navigation caused the collision is amply supported by the record.
 
 
 5
 The liability of the Melrose is not so clear. Judge Murphy's finding of fault was based on a supposed violation of Pilot Rule VII (now Section 80.7 of the Pilot Rules for Inland Waters)[1] usually known as the "starboard hand" rule. He thought the second paragraph of that rule became applicable when the Melrose received Sandcraft's two-blast signal; and that consequently Melrose violated that rule in failing then to sound the danger signal and reverse. Counsel for the Melrose point to the fact that the second paragraph of the Rule is expressly limited to cases involving "conditions covered by this situation," i. e., to the crossing situation dealt with in the starboard hand rule stated in the first paragraph, citing Portal S. S. Co. v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335, and our interpretation of that decision in Portal S. S. Corp. v. Southern Pacific Co., 2 Cir., 112 F.2d 297. He contends that this is not a "starboard hand rule" case because that rule is applicable only to vessels on well defined courses which have each other in sight at sufficient distance and in sufficient time to know what their respective courses are, citing Erie R. Co. v. The Invader, 2 Cir., 159 F.2d 648; The Cotopaxi, 2 Cir., 20 F.2d 568; Griffin on Collision § 42. We incline to sustain the Melrose's position thus far. We think it scarcely reasonable so to construe the starboard hand rule as to make it applicable to the situation here in which Sandcraft, to use a mixed metaphor, was acting like a maverick loose in the harbor.
 
 
 6
 However, we think it unnecessary to make a definitive ruling as to the applicability of Pilot Rule VII. For in any event, even Melrose concedes the applicability of the rule of special circumstances embodied in Article 27 of the Inland Rules, 33 U.S.C.A. § 212.[2] We think that under this rule the Melrose failed to show due regard to the danger of collision which arose when Sandcraft in emerging into the fairway turned first down-channel, apparently to effect a port to port passing, and then, crossing Melrose's one whistle signal, turned across the channel apparently intending either to cross Melrose's bow or to turn up-channel. We hold that immediately upon hearing Sandcraft's two-blast signal, Melrose should have reversed and sounded the danger signal. Its failure to do so was negligence which contributed to the collision: its conduct was not consistent with the exercise of reasonable judgment.
 
 
 7
 It is argued for Melrose that she was not bound to anticipate negligent navigation by the Sandcraft, citing Great Lakes D & D Co. v. The Santiago, 2 Cir., 155 F.2d 148, 150. But here Melrose had already witnessed negligent navigation by Sandcraft, — conduct which even Melrose counsel insists was negligent. We are left cold by the argument that under "the special circumstances" Melrose was entitled to assume from Sandcraft's two-blast signal that although obviously outward bound she would continue her gyration to her left to an up-channel course. The numerous cases cited for Melrose all fall short of supporting such a contention. Our decision in Bouchard Transportation Co. v. The Providence, 2 Cir., 223 F.2d 404, is not to the contrary. There a port to port passing had been agreed upon and the Rowen Card, whom we exonerated, instead of reversing, was using her engine to get further to the starboard and thereby to decrease the hazard of collision with the oncoming Providence. There was no basis for a belief by Rowen Card, a tug, that reversal of her engine would have decreased the hazard of collision with her powerless tow which, as it developed, received the brunt of the collision.
 
 
 8
 We agree with Melrose's counsel that the fault of Sandcraft was far more flagrant than that of Melrose. But even so, we hold that Melrose's fault was too clear and substantial to bring her within the "major-minor fault rule."
 
 
 9
 Affirmed on both appeals.
 
 
 
 Notes:
 
 
 [1]
 "80.7Vessels approaching each other at right angles or obliquely. — When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.
 "If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood. (Formerly Pilot Rule VII.)"
 
 
 [2]
 33 U.S.C.A. § 212. "Special circumstances requiring departure from rules. Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."
 
 
 On Petition for Rehearing
 
 10
 PER CURIAM.
 
 
 11
 This petition, brought by the appellants Charles Francis Adams et al., trustees, as Owners of the S.S. Melrose, fails to persuade us to change our decision or modify our opinion.
 
 
 12
 The contention now made that the damages should be proportioned in accordance with the comparative faults of the colliding vessels, is overruled. In so ruling we do not disagree with the finding below that a division of the damages, 80% against Sandcraft and 20% against Melrose, would accord with the facts and the equities. However, the trial judge was plainly right in holding that prior decisions of this court required that the damages be equally divided. Ahlgren v. Red Star Towing & Transportation Co., 2 Cir., 214 F.2d 618, 621. We have frequently called attention to the inherent injustice of this rule. Ahlgren v. Red Star Towing & Transportation Co., supra; The City of Chattanooga, 2 Cir., 79 F.2d 23. See also dissenting opinion of Judge L. Hand in Ulster Oil Transport Corp. v. The Matton, 2 Cir., 210 F.2d 106, 110. But the rule of equal division of property damage is so well established in this country that it would create intolerable confusion were a court of intermediate jurisdiction such as ours to deviate from it. We shall therefore continue to apply the rule until there shall be authoritative sanction for departure therefrom.
 
 
 13
 Petition denied.