282 F.2d 120
 NORTHERN PETROLEUM TANK STEAMSHIP CO., Ltd., as Owner of the Motor Vessel Tynefield, Libelant-Appellant,
v.
CITY OF NEW YORK, as Owner of THE Ferryboat DONGAN HILLS, Respondent-Appellee.
CITY OF NEW YORK, as Owner of the Ferryboat Dongan Hills, Libelant-Appellee,
v.
THE M/V TYNEFIELD, her engines, etc., and
The Northern Petroleum Tank Steamship Co., Ltd., Hastings & Sons, and Furness Withy & Co., Ltd., Respondents-Appellants.
Petition of CITY OF NEW YORK, as Owner of the Ferryboat Dongan Hills for a limitation or exoneration from liability.
 No. 332.
 No. 333.
 No. 334.
 Docket 26149.
 Docket 26150.
 Docket 26151.
 United States Court of Appeals Second Circuit.
 Argued June 16, 1960.
 Decided August 11, 1960.
 
 William Warner, Symmers, Fish & Warner, New York City, for Northern Petroleum Tank S.S. Co., Ltd.
 Eugene J. Keefe, Charles H. Tenney, Corp. Counsel, New York City, Seymour B. Quel, New York City, of counsel, for City of New York.
 Before WATERMAN, MOORE and HAMLIN, Circuit Judges.
 LEONARD P. MOORE, Circuit Judge.
 
 
 1
 On February 8, 1958 at about 8:00 p. m., the tanker Tynefield owned and operated by the Northern Petroleum Tank Steamship Co., Ltd., Hastings & Sons and Furness Withy & Co. (collectively "Northern") and the Staten Island ferryboat Dongan Hills owned and operated by the City of New York (the "City") were in collision in New York Harbor. Three proceedings (consolidated for trial) resulted: (1) by Northern against the City and the Dongan Hills; (2) by the City against Northern and the Tynefield; and (3) a petition by the City for limitation of, or exoneration from, liability. From an interlocutory decree holding both vessels equally at fault, City and Northern appeal, each arguing that the collision was solely the fault of the other. The City also appeals from the denial of its limitation or exoneration petition.
 
 
 2
 The facts material to the applicable legal principles governing the determination of this controversy for the most part have been found by the trial court and are adequately supported by the evidence.
 
 
 3
 During the evening of February 8, 1956, the Dongan Hills was on its regular run from South Ferry, Manhattan, to Staten Island and the Tynefield, having left Bayonne, New Jersey, was en route across the Harbor bound for Kingston, New York, which is some 90 miles up the Hudson River. The Harbor was practically devoid of traffic. The Tynefield was making about 2½ to 5 knots heading east; the Dongan Hills about 13 knots southwest. There was a strong (25-30 miles) northwest wind. Both vessels had their navigation and running lights on at the time. Visibility was excellent.
 
 
 4
 The Tynefield had departed from its dock under control of the docking pilot. About four minutes before the collision the river pilot had taken over. On the bridge were the docking and river pilots, the master, the third officer and the helmsman. The Dongan Hills was observed about a mile away off the port bow. Except for the pilots and officers on the bridge there was no lookout stationed at the bow. The Tynefield as the privileged vessel maintained its course. It so indicated its intention by one long blast of its whistle. Receiving no response, a second blast was sounded. When a collision seemed imminent the danger signal consisting of a series of short blasts was sounded, the engine put full astern and the rudder hard right. Nevertheless, the Dongan Hills continuing on its course, struck the Tynefield almost at right angles on the port bow penetrating her number one tank.
 
 
 5
 In the pilot house of the Dongan Hills were the captain and assistant captain. The trial court found that "the Dongan Hills had no lookout whatsoever" and that "the assistant captain was obviously not keeping a sharp lookout, and since he had the wheel at the time cannot be considered as performing the duties of a lookout. The captain, comfortable upon the settee, was not a lookout either." No crew member was serving as a lookout. The captain and assistant captain first saw the Tynefield when it was some 600 to 700 feet away. It too gave a series of danger blasts but despite a full speed astern command the Dongan Hills collided with the Tynefield. As the trial court found as a fact, "the Dongan Hills assumed she had some prescriptive rights to the fairway and just kept plowing ahead on schedule."
 
 
 6
 In appraising the actions of each vessel prior to collision the primary inquiry must relate to their respective obligations and duties. New York Harbor is used by ships of all types. Ferryboats have no special "prescriptive rights" (Pitney v. United States, 2 Cir., 1945, 149 F.2d 907; The Red Star Towing & Transportation Co. v. Director General of R.R., 2 Cir., 1923, 292 F. 854). Inland and Pilot Rules of the Road apply and in this case, i.e., "Vessels approaching each other at right angles or obliquely," "the steam vessel which has the other on her own port side shall hold her course and speed"; the other vessel must keep out of the way "by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse." 33 C.F.R. 80.7; 33 U.S.C.A. §§ 204, 206. Thus the Tynefield as the privileged vessel had a right to continue on its course and to assume that the Dongan Hills would so maneuver as to comply with the Rule. In addition to its reliance on the Rule, the Tynefield by its single blast (repeated a second time) gave a similar guide to its intention of proceeding on course. In the comparatively few moments remaining and when collision seemed likely, both vessels blew the danger signal and attempted to stop as required by the same Rule.
 
 
 7
 Under the circumstances what more could the Tynefield have done? The entire purpose of any navigational rule is to create as much certainty as possible so that each vessel can conduct itself accordingly. The Tynefield had a right (even a duty as well) to maintain its course until collision appeared likely. The Dongan Hills was under an obligation to avoid a collision by obeying the rule and the Tynefield had a right to expect that she would do so. The Tynefield blew the correct whistle signals and when danger was apparent sounded the danger signal, endeavored to stop and veer off to starboard. But even if she had not signaled, "Being the privileged vessel, she was under no such duty. The Hoboken, 59 F.2d 993, 995 (C.C.A.2)." The Boston Socony, 2 Cir., 1933, 63 F.2d 246, 248.
 
 
 8
 In view of this long recognized navigational rule and the importance of strict adherence thereto, the trial court's conclusions that "Regardless of the right and privilege of the Tynefield to maintain her course and speed there was a continuing duty on her part to exercise care to avoid collision until the crossing was safely effected"; that the Tynefield "failed to change her speed and course until too late"; and "took no precaution to avoid the impending collision until it was too late, relying recklessly on its `privilege' in this crossing situation" are not in accord with the law. It was not reckless for the Tynefield to rely on its privilege. To the contrary she was obliged under the Rule to maintain her course (The Delaware, 1896, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771). She cannot be charged with any failure to change her speed and course when to have done so would have violated the Rule. Nor did she have any reason to believe that the Dongan Hills would not comply with the Rule. It was the Dongan Hills' duty to change her course and speed (if necessary) to avoid collision. And had there been an adequate lookout the Tynefield should have been observed. Once observed the ferry could have and should have veered to starboard and passed astern of the tanker.
 
 
 9
 The City argues that "the basic cause of the collision in the case at bar was the failure of the Tynefield to be properly lighted." The trial court found that "both vessels had their navigation and running lights on at the time." The docking pilot of the Tynefield had testified that he saw "The starboard light and the port light, and then you could see the flare of it, the glow of the white light on the forward mast and the after mast." The Captain of the Tynefield had observed the "light indicator" which indicated that "the foremast light, the main mast light, the two side lights, port and starboard side lights and the stern light were all burning." From his position on the bridge he testified that he also actually saw the foremast light and the starboard side light. The City's argument that the Tynefield was improperly lighted is not supported by the testimony.
 
 
 10
 The trial court relied upon certain erasures in the Tynefield's log books as covering some default and justifying some adverse inference. However, the subject matter of the erasures did not relate to the violation of the rules of the road by the Dongan Hills. There was no sufficient proof that any change in speed, helmsmen or pilots was the cause of the collision. The absence of any designated lookout on the Tynefield was not a contributing cause. She had two officers and two pilots on duty on the bridge who saw the Dongan Hills from a distance of a mile.
 
 
 11
 The City also contends that the Tynefield changed her course and speed. The trial court found as a fact that the speed was not so reduced but any last-minute effort to avoid collision by so doing would not constitute fault.
 
 
 12
 There is no merit to the City's argument that the Tynefield entrance into the channel was improper. No proof was submitted that vessels coming out of the Kill Van Kull had to follow any special channel or course or that ferryboats were entitled to a path into which other ships trespassed at their peril.
 
 
 13
 The trial court concluded as to the City's petition for limitation of liability that it had failed to meet its burden of establishing that it had no knowledge of the operational negligence involved here. Having found that Captain McGuire, the director of ferry operations for the City, had knowledge that lookouts were not maintained on the ferries, and that absence of a lookout was a contributing cause of the collision, the court properly denied the petition.
 
 
 14
 Since upon the facts the Dongan Hills was solely liable as a matter of law, the decree of the district court should be modified to so provide, with costs to appellant, Northern Petroleum Tank Steamship Co., Ltd.