## CITY OF NEW YORK v. AMERICAN EXPORT LINES, Inc.

### No. 26.

Circuit Court of Appeals, Second Circuit.

Dec. 2, 1942.

John W. Griffin and Haight, Griffin, Deming & Gardner, all of New York City (W. Parker Sedgwick, of New York City, of counsel), for appellant.

John D. J. Moore, Jr., and William C. Chanler, both of New York City (Martin

Faust, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

## L. HAND, Circuit Judge.

The claimant of the ship, "Exporter," appeals from a decree in the admiralty holding her solely at fault for a collision with the "sludge boat," "Coney Island," owned by the City of New York. The collision was on a clear night, in the East River, opposite Corlear's Hook, about one third of the distance from the New York to the Brooklyn shore. The "Exporter" was bound downstream against a flood tide, the "Coney Island" upstream; the district judge found that the situation called for a starboard to starboard passing in which the "Exporter" did not do her duty.

First, as to the position of the "Exporter." Although the judge made no finding on the point, it is clear that when the "Exporter" passed under the Williamsburg Bridge she was not very far to the east of midstream, probably about one hundred feet. On her way down she had had to turn to the left to avoid an upbound tow, the tail of which the tide had swung over to the east as it rounded Corlear's Hook; she was working back again to midstream under a right rudder as she went under the bridge. Moreover, although the "Coney Island's" master placed the "Exporter" much nearer to the Brooklyn shore, his mate did not agree with him, nor did a deckhand on the upbound tow. Next, as to her signals. Her master, pilot and lookout say that as she went under the bridge she blew a single blast to the "Coney Island" which she made out opposite Hudson Street below the Navy Yard. Although the judge did not find that she did not sound this signal, he did find that if it was sounded, she had not yet sighted the "Coney Island," and that she sounded it to a tow bound across her course. We find that she did sound a single blast at that time, not only because of the testimony of those aboard her, but of several watermen aboard nearby tugs who had no conceivable reason to invent such a signal. The fact that those on board the "Coney Island" may not have heard it, as they said, is very slight reason for doubting our conclusion. Furthermore, we find that this signal was to the "Coney Island." The alternative is that it was to the tug and tow we have

mentioned which was drifting with the tide into Wallabout Bay. Although this tow had crossed the course of the "Exporter" and although the tug master thought that the signal might have been for him, that was extremely unlikely. By the time the "Coney Island" passed him he had already got close to a warship moored at the Navy Yard, and that could have been not more than two minutes after the "Exporter" sounded her signal. The judge apparently discredited the "Exporter's" pilot and the master because each had sworn before the Local Inspectors that they observed a swing of the "Coney Island"— which we shall describe in a moment—by means of range lights which in fact she did not carry; and because the master repeated this upon his deposition. That was scarcely a reason for discrediting the lookout as well; and in our judgment it did not justify disregarding all that the pilot and master said. Nothing was more natural than for nautical men quite innocently to fabricate that the "Coney Island" had the usual equipment for vessels of her kind, and to assume that they traced her movement by nonexistent lights. We conclude, therefore, that the "Exporter" sounded a single blast directly to the "Coney Island" at the time when she, the "Exporter," was passing under the Williamsburg Bridge.

Very shortly after making out the "Exporter," the "Coney Island" sounded a double blast, and her master told the quartermaster "to left (sic) her as I was coming around the point at the Hook about 600 feet off the New York shore." In a few seconds he gave the order to steady, whereupon, as he said, the "Exporter" sounded a single blast. He was supported in this story by his mate, his helmsman and the lookout; and, as we have said, although the judge was not sure that the "Exporter" ever sounded any single blast, he found that if she did, it followed the "Coney Island's" double blast. Every other witness who heard the signals at all said that the "Exporter's" single blast came first and that she gave no signal after the "Coney Island's" except a double blast in extremis. We are satisfied that, whatever signals she sounded, the "Exporter" did not sound two separate signals after the "Coney Island." The choice is narrowed to a single signal of one blast or of two; and we have the finding that the "Exporter" did sound two blasts. For these reasons we conclude that the "Exporter" sounded one blast to

the "Coney Island" while under the bridge, and that she answered the "Coney Island's" double blast with a similar signal of her own.

▮ The "Exporter" recognized that the situation was one of great peril as soon.as the "Coney Island" crossed her signal, for the "Coney Island" was coming up in midstream at about ten knots. Two courses were open to the "Exporter": to stop and back, or to swing to port in attempted coöperation. She chose the second and not only sounded the signal we have just mentioned but put her helm hard left. It makes no difference whether or not that was the right thing to do—we rather think it was—the occasion did not permit nice calculation and her choice cannot be charged against her as a fault; it was in no sense an "acceptance" of the "Coney Island's" proposal; it was forced upon her willy-nilly by conduct which as we shall show was utterly unjustified. After the "Coney Island" got the "Exporter's" signal—mistakenly said to have been a single blast—in answer to her own, she saw that a collision was inevitable and stopped and backed. She must have already been for a very substantial period under a left rudder because of the place of the collision—only one third of the way from the New York shore—and because she had turned nearly if not quite eight points. The vessels came together at an angle of about forty-five degrees, the "Exporter's" bow striking the "Coney Island's" starboard side about midships.

▮ The East River not being a "narrow channel" (The Wrestler, 2 Cir., 232 F. 448), either ship was free to go up on either side and the situation was governed only by Article 18, Rule 1, of the Inland Rules, § 203, 33 U.S.C.A. The "Coney Island" was, however, at fault even if the situation called for a starboard to starboard passing because she did not wait for an assent to her double blast before putting over her helm. Marshall Field & Co. v. United States, 2 Cir., 48 F.2d 763; Chester A. Poling v. United States, 2 Cir., 55 F.2d 921; The D. S. Dumper No. 305, 2 Cir., 77 F.2d 315. She was further at fault because the vessels should have passed port to port anyway. It is now hardly necessary to say that in a crooked channel the test whether the relative position of two vessels requires them to pass port to port or starboard to starboard, is not their relative headings when one is in one reach of the channel and the other in the other. Their duties are fixed by their positions in the channel itself—strictly by their relative headings if the channel were straight. Construction Aggregates Co. v. Long Island R. Co., 2 Cir., 105 F.2d 1009. In the case at bar the duties were therefore fixed by whether, had they been where they actually were in the channel but the channel had been straight, they would each have seen both the other's running lights. It can be readily shown that that is exactly what each would have seen. They were about 3000 feet apart when the "Exporter" sounded her first signal—the "Coney Island" in midstream, the "Exporter" not more than 100 feet to the east of midstream. A line between them in those positions would make an angle of less than three degrees with the thread of the river, and both running lights are visible over a larger angle than that. The prescribed three-foot screens (Art. 2(d), § 172(d), 33 U.S.C.A.) do not absolutely shut out lights across the bow, even though the "batten" recommended by Admiral Knight be added. Modern Seamanship, 7th Edition, p. 338, Note 1. The excuse put forward by the "Coney Island" for her failure to pass port to port is that her way was blocked by shipping. It is true that there were three tugs above her on that side of the river, but they were all close to the Brooklyn shore and there was a clear passage between the "Exporter" and the nearest of them of at least 400 or 500 feet. In spite of the finding we cannot accept this excuse; indeed, we are satisfied that the real reason why the "Coney Island" went off to port was, not because of these tugs, but because her master wished to gain time by cutting the corner—he "was coming around the point at the Hook 600 feet off the New York shore."

▮ As to the "Exporter's" faults, we have already said that we would not hold her for her double blast, and there remains only the fact that she put her rudder right before she got an answer from the "Coney Island" to her first signal. We held in Construction Aggregates Co. v. Long Island R. Co., supra, 105 F.2d 1009, that in a port to port passing, a vessel sounding a single blast must wait before putting her helm over until she receives the assent of the other, just as she must in a starboard to starboard passing. This is not contrary to the decisions cited for the opposite conclusion. In The Amolco, 1

Cir., 283 F. 890, the "Amolco" was indeed exonerated although she changed her helm without any assent from the "Heroine," but, so far as appears, the "Heroine" did not assert this as a fault; and certainly the court did not consider the question. We cannot understand why The Dauntless, 2 Cir., 3 F.2d 529, should be cited; the report does not say that the "Dauntless" changed her helm at all. It is quite true that in The Bilbster, 2 Cir., 6 F.2d 954, page 956, Judge Manton said that "The Stavangaren ported her helm when she blew the one whistle as required," but once more the failure to get an assent does not appear to have been argued, and it seems fairly plain that the fault could not have contributed anyway. Wilson v. Currie, 1894 A.C. 116, dealt with a rule which did not require any signal for passing. We do not indeed mean that if the vessels are so close when they first see each other that the one which signals first cannot safely wait for an answer, she must do so; but when she is not pressed, she should learn whether, the other vessel sees the mutual positions as she does. It begs the question to say that if the situation is really "head and head" each vessel has only one duty; i. e. to port; that is true only if both so understand it. They may not; nothing is more common than for one to understand it in one way and the other in the other, particularly in a case like this where there is a bend in the channel. The only safe course is for the first vessel not to assume —even when the facts bear her out—that the other sees the situation as she does until she gets an assent. So the rule reads; so the Local Inspectors have understood it; so we have decided not only in Construction Aggregates Co. v. Long Island R. Co., supra, but in The Richard J. Barnes, 2 Cir., 111 F.2d 294.

The "Exporter" was therefore at fault and the damages would have to be divided unless she can show that this fault did not contribute to the collision. That question demands a closer examination of her navigation. It will be remembered that she had already put her helm over to round the stern of the tow before she sounded one blast to the "Coney Island"; she was therefore only accelerating a swing already begun, when she put it still further over at the time of her signal. It is impossible to be sure how long her rudder remained in that position; several witnesses did testify, however, to the length of the interval between her signal and the "Coney Island's,"

and their estimates varied between a minute and a half minute. As the first favors the "Coney Island" more than the second, we shall assume that the "Exporter" continued under her right rudder for a minute before she put her helm over hard left after getting the "Coney Island's" double blast. The question is how much further off to starboard she had gone before she made this change than if she had steadied after rounding the stern of the tow, and whether her failure to steady contributed to the collision. We cannot estimate this because we do not know how far over the two helm changes together had moved the rudder; but we can estimate how far to starboard she would have gone if she had put her rudder hard over to the right, and if that would not have changed her position enough to contribute to the collision, we can be sure that her actual helm movements a fortiori did not do so. She was 450 feet long and moving at about seven knots through the water—700 feet a minute. Hence in a minute she moved about a length and a half. By the use of Admiral Knight's "turning curves" (op. cit. pp. 303, 306) we can readily see that although her heading might have changed two points in that distance, her bow would scarcely have left her course and her stern would still be to the east of it. Thus we can be reasonably sure that with her rudder as it actually was, she had left her course hardly at all though she changed her heading possibly as much as two points. Therefore we can say that if she had steadied after rounding the tow, it would not have made any difference in the result except perhaps to change the angle of collision from four to two points. It is true that such calculations cannot be relied upon beyond the reasonable doubt which ordinarily the "Exporter" would be bound to exclude for the breach of a statutory duty; but here that is not necessary. We regard the navigation of the "Coney Island" as exceptionally reprehensible; without excuse, merely for her own convenience, and without any assent she tried to change a port to port passing into a starboard to starboard. The "Exporter," on the other hand, was guilty of only a venial fault, shared, we fancy, by masters very generally; and that fault, so far as can be ascertained, had nothing to do with the result. The decree will be reversed and the "Coney Island" will be held solely at fault.

Decree reversed.