BARGE POLING BROS. NO. 23,
INC., Plaintiff,

v.

Skibs A. S. NAMSET et al., Defendants.

No. 73 Civ. 4066.

United States District Court,
S. D. New York.

April 5, 1977.

Macklin, Hanan & McKernan by Timothy A. Hanan, Wellington M. Watters, New York City, for plaintiff.

Haight, Gardner, Poor & Havens by Richard G. Ashworth, Richard L. Jarashow, New York City, for defendants Skibs A/S Nanset and S.S. Anco Swift.

Crowell, Rouse & Varian by William T. Foley, Jr., New York City, for defendants Alban & Poling Towing Co., Inc., and Tug Phoenix.

## INTRODUCTION

MOTLEY, District Judge.

This is an action arising out of a collision in the East River, New York on May 26, 1973 between the American flag petroleum barge Poling Bros. No. 23, propelled by the American flag tug Phoenix, and the Norwegian flag tanker S.S. Anco Swift. The owner of the barge has brought an action in admiralty against the owner of the S.S. Anco Swift and against the S.S. Anco Swift *in rem*, and has also sued the owner of the tug Phoenix and the tug Phoenix *in rem* for damages sustained by the barge in the collision. The owner of the S.S. Anco Swift has cross-claimed against the owner of the Phoenix for damages sustained by the ship and for indemnification for whatever damages it might be found liable to pay to the owner of the barge. The owner of the tug Phoenix, while sustaining no damages for which it seeks recovery here, has cross-claimed against the owner of the ship for indemnification for whatever damages it might be found liable to pay to the owner of the barge.

The case was tried to the court without a jury on May 11, 12, and 13, 1976.

## FINDINGS OF FACT

At the times pertinent to the claims herein, plaintiff, barge Poling Bros. No. 23, Inc., was a United States corporation, and the owner and operator of the barge Poling Bros. No. 23 ("the barge"); defendant-claimant Skibs A/S Nanset (sued herein as Skibs A.S. Namset) was a Norwegian corporation and the owner and operator of the steamship Anco Swift ("the ship"); and defendant-claimant Alban & Poling Towing Co., Inc. was a United States corporation and the owner and operator of the tug Phoenix ("the tug").

The barge Poling Bros. No. 23 is a steel hull tank barge without motive power, with a gross and net tonnage of 1,844 tons, a length of 323.6 feet, a breadth of 43 feet, and a depth of 14.5 feet. The Anco Swift is an ocean-going tanker with a dead weight of 20,550 tons, a length of 556.9 feet, a breadth of 72 feet, a moulded depth of 40.1 feet, and with 9300 brake horsepower. At the pertinent time, her draft was 19' 7" forward and 30' 4" aft. The tug Phoenix is a steel hull towboat with a length of 95.2 feet, a breadth of 25.1 feet, a depth of 10.6 feet, and with 1200 horsepower.

At approximately four o'clock (0400) on the morning of May 26, 1973, the tug Phoenix, with her bow made fast in the towing notch in the stern of the barge by two wire rope cables, was pushing the barge ahead going upstream in the East River of New York in the area of the Williamsburg bridge. The tug and barge, which carried 18,000 barrels of gasoline, had left Port Reading, New Jersey at approximately 0100 that day bound for Glenwood Landing,

Long Island via Lower New York harbor, the East River, and Long Island Sound. Aboard the barge were two crewmen, one of whom checked the lights of the barge about 0320 and found them in proper order. The tug was under the command of Captain Carlton B. Cornelius,[1] who was standing watch alone on the bridge of his vessel.

At approximately the same time, the Anco Swift was proceeding downstream on the Manhattan side of the river in the vicinity of 35th Street. Partially laden with a cargo of molasses, the ship had departed from Groton, Connecticut in the early evening of May 25, and was bound for the Nepco Terminal at North 1st Street in Brooklyn. The ship was under the command of Captain Richard A. Chambers, an experienced licensed pilot who had boarded the ship as it was underway in the vicinity of City Island in the East River. With the pilot on the bridge were the ship's captain, Magnar Solberg,[2] and a helmsman. The first officer was on the forecastle with the lookout standing by the anchors, the second officer was on deck waiting to meet the docking pilot, and the chief officer had returned home to Norway from Groton due to illness.

This ship had proceeded down the East River from City Island. At 0352, the pilot

had ordered full ahead which, on the Anco Swift, meant a speed of approximately thirteen knots through the water. However, the ship's speed over the ground was reduced to approximately eleven knots by the effect of a two knot flood tide in the river. At 0355, the ship had passed the Queensboro (59th Street) bridge and, by 0400, the ship was in the vicinity of 35th Street with her engines still at full ahead. Visibility was good, estimated at ten miles where unobstructed.

As he came down the river, the pilot had been in two-way radio communication with several other vessels over his walkie-talkie, which was tuned to Channel 13, the channel used for harbor navigation generally.[3] By this means, he arranged starboard to starboard passages with two tugs and tows in the vicinity of 42nd Street in Manhattan.

At approximately 0400, the Anco Swift was met by two other tugs—the Jane McAllister and the Helen McAllister—which were to assist her in docking in Brooklyn. The docking pilot, who was aboard the latter vessel awaiting the opportunity to go alongside and board the Anco Swift, spoke by radio telephone with the pilot on the Anco Swift and asked him to reduce the ship's speed in order that he might come aboard by fixed ladder.[4] How-

1. Captain Cornelius did not, at the time of the accident, hold a license from the Coast Guard to perform his duties as a tug captain since there was at that time no Coast Guard requirement that he be licensed. The Coast Guard subsequently imposed such a requirement, however, during the summer of 1973. He then prepared for the Coast Guard license examination and passed it in September of 1973.

   Captain Cornelius had previously served as a seaman on tugs since roughly 1960, although much of his experience had not been in the New York area. Around 1965, he had served for about a year and a half on a tug which made regular runs from Baltimore to New Haven through New York harbor, including passages at night. Except for a period of about a week on a tug in Norfolk, Virginia, however, Captain Cornelius had had no experience as a mate prior to assuming command of the Phoenix on February 28, 1973. His training had been informal, on-the-job experience, and he had attended no nautical school to qualify as a mate.

2. Captain Solberg was an experienced mariner, having been at sea since 1953. He spent over two years in formal marine officer training beginning in 1960, and was first licensed as a ship's officer under Norwegian law in 1961. He obtained his master's license in 1969 and first sailed as a master (for four months) in 1972 on the Anco Star. From that ship, he joined the Anco Swift as Chief Officer, and became her master on April 2, 1973.

3. The ship's radio, which also could be tuned to Channel 13, was turned on but was not used during this period of time, since the bridge personnel were relying upon the pilot's walkie-talkie for communication.

4. Because the pilot customarily boarded the ship by fixed ladder, the ship had to proceed at a speed slower than that which might otherwise be safe for navigation on the river.

ever, the pilot, who soon was to become concerned with the proximity of the tug Phoenix and her tow, asked the McAllister tugs to stay clear. Accordingly, the tugs remained at some distance off the ship's starboard side and behind her.

Shortly after 0400, the Anco Swift was nearing a scheduled turning point in her voyage down the East River. Although the river curves somewhat between Roosevelt Island and the Williamsburg bridge, the channel for deep draft vessels bends more sharply because the Manhattan side of the river begins to shoal significantly south of 35th Street. From roughly 24th Street southward, the 30-foot depth curve extends out almost to the middle of the river. Between 24th Street and 17th Street, United States Coast and Geodetic Survey chart no. 745 reveals four spots of 25-foot depth immediately adjacent to the 30-foot depth curve. Accordingly, even making due allowance for the fact that the depth of the river in this area at flood tide may be increased by from four to six feet, there exists a significant hazard to deep draft vessels which requires that they keep to the middle or Brooklyn side of the river, where there is ample water up to the heads of the piers.

To facilitate safe navigation in this area, the United States government has established a range, known as the Poorhouse Flats Range ("the range"), consisting of two lights located on the Brooklyn shore in such a position that a downbound deep draft vessel navigating with these lights in line will stay clear of the 30-foot depth curve, her course running diagonally from the Manhattan side (at about 32nd Street)

to the Brooklyn side (at about North 10th Street) of the river, 150 yards off the shoal.

At approximately 0402 in the vicinity of Bellevue Hospital in Manhattan, Captain Chambers began his turn of the Anco Swift onto the range, coming to a course of 165 degrees.[5] As he was making his turn, he first sighted the tug and tow about 45 degrees off his starboard bow. The Phoenix appeared to be in the middle of the river, about a mile to a mile and a half away. The pilot was able to see both the red (port) and green (starboard) sidelights of the vessel as well as the white running and towing lights, indicating a frontal aspect of the tug and tow. Because the tug appeared to be in the middle of the river heading somewhat toward the Manhattan side, and because he understood it to be a practice of shallow draft vessels to bear to the Manhattan side of the channel, the pilot inferred that the tug intended a starboard to starboard passage, with the tanker crossing the river on the range and then proceeding downstream in the deep water on the Brooklyn side of the river (the starboard side of the tug and tow).

To confirm that this mode of passage was acceptable to the tug captain, the pilot gave his position over his walkie-talkie and attempted to contact the tug as a "security check". The tug captain, who had just sighted the Anco Swift in what appeared to him to be the vicinity of the quick flashing buoy on the Manhattan side of the river near 32nd Street, returned the call on Channel 13,[6] but received no response from the tanker. Although the tug's call was received on at least one other vessel,[7] the pilot did not, for some reason, hear the response.

5. A few degrees to the right of the range course, to compensate for the effect of the flood tide.

6. A peculiarity of terminology among mariners in the East River is that vessels proceeding upstream are referred to as proceeding "eastbound", while vessels proceeding downstream are proceeding "westbound", despite the fact that a vessel going downstream may actually be proceeding in an "easterly" direction. Therefore, the Anco Swift would properly be considered a "westbound" ship at this point in the river.

The tug captain testified that he called the "westbound" ship in the river. However, the mate of the tug Jane McAllister-Robert Markuske—testified that he heard the call from the Phoenix, that the call was addressed to the "eastbound" ship in the river, and that he was puzzled by the error. The tug's captain, Captain Cornelius, later acknowledged that he may have erroneously called the "eastbound" vessel.

7. The tug Jane McAllister.

The tug captain later blinked his searchlight at the ship to alert its crew of the tug's presence, but the record does not reflect whether this signal was ever noticed by the Anco Swift.

Much of what followed may be attributed to this lack of communication. Unfortunately, the tug's mate, Captain Cornelius, did not share Captain Chambers' perception of the maneuvering situation. Captain Cornelius believed from the outset that the proper mode of passage would be a port to port passage, with the tug and tow continuing close to the Brooklyn side of the river, and the tanker turning right off the range and passing down her port side in the center of the river. Despite the fact that he was intending to utilize the channel to the west of Roosevelt Island farther upstream, he saw no necessity to travel over the shallower water on the Manhattan side of the river south of Bellevue.[8] Captain Cornelius, whose vessel was at all times apparently closer to the center of the river than he realized (or was later willing to admit), soon began to experience doubts, however, as to whether there was really room in the deep water channel for a port to port passage. Accordingly, without sounding any whistle signal to indicate either his doubt or his intent to turn, he put his rudder about 15 degrees to the right and began a turn to starboard.

As the tug turned, between 0402 and 0403, its green sidelight disappeared from Captain Chambers' view on the bridge of the Anco Swift (less than a mile away) and from that time until the time of collision some three minutes later, he could see only the tug's port sidelight. Since the tug's apparent turn did not conform to his previous expectation of a starboard to starboard passage, the pilot was uncertain as to the tug's intention. He did not, however, promptly blow the danger signal on the ship's whistle to indicate his doubt. Instead, at 0403, he ordered the ship's speed reduced to slow ahead and, a few seconds later, to dead slow ahead. As it became more clear to him that the tug was turning toward Brooklyn and that it desired a port to port passage, Captain Chambers sounded one short blast on the whistle (indicating his intention to turn to starboard) and, without any reply from the Phoenix, ordered hard right rudder in an effort to conform to the tug's apparent desires.

At this point, the tug was still on the ship's starboard bow, and Captain Solberg felt that a port to port passage was unsafe. Trusting in the pilot's judgment, however, he did not voice his opinion.

In the meantime, Captain Cornelius had reduced the speed of the tug and tow to half ahead. As the Anco Swift was beginning its turn to starboard (coming right 10 to 15 degrees), therefore, the tug appeared to those on the Anco Swift to be losing headway and, perhaps, to be at the mercy of the tide. Thinking better of his turn to starboard, the pilot then, a few seconds later, shifted the tanker's rudder briefly to hard port, and then put the rudder amidships.

When Captain Cornelius saw the tanker attempting to come to starboard, he immediately concluded that a port to port passage was impossible, twice blew the danger signal on his whistle, and reversed his engines. At this point, about 0404, the tanker and barge were roughly 350 yards apart. The pilot on the Anco Swift, hearing the danger signals from the tug, successively ordered his engines stopped, twice ordered full astern, sounded the backing signal, sounded the danger signal, and ordered the port anchor dropped in an effort to slow the ship's advance.[9]

Although the engines of both vessels were backing full, the bow of the barge collided with the Anco Swift's bow about eighteen feet behind the stem of the tanker. The impact of the collision caused the port cables securing the tug to the barge to part, forcing the tug out of the towing notch and

---

8. He conceded at trial, however, that there was no reason why he could not have traveled up the Manhattan side of the river.

9. He testified that he was afraid to drop the starboard anchor for fear that it might land on the barge.

requiring the assistance of the two McAllister tugs to get the tow back under the Phoenix' control. Both the bow of the barge and the bow of the ship sustained substantial damage, although both vessels were later able to proceed to their respective destinations. The momentum of the tanker carried her across the barge's bow to a position off the barge's starboard side, where she finally stopped her engines about a minute after the collision, and where she remained until later allowed to proceed.

The point of collision was on the Poorhouse Flats Range, some 200 yards off the end of the pier at the head of Milton Street in Brooklyn. At the time of collision, the tanker's heading was roughly due south but, when the ship finally stopped, its bow was headed toward the Brooklyn shore.

## CONCLUSIONS OF LAW

This action comes within the admiralty and maritime jurisdiction granted to this court by 28 U.S.C. § 1333. The court has jurisdiction over the parties to this action; indeed, jurisdiction is not contested. The applicable navigational rules and regulations are the Inland Rules of the Road, 33 U.S.C. §§ 154 *et seq.*, and the Pilot Rules for Inland Waters, 33 C.F.R. Part 80.

■ The plaintiff barge in this case is free of contributory negligence and is entitled to recovery for the damages sustained in the collision. As a barge without motive power, she was under no further duty than to ensure that the proper navigational lights were burning, and this she did. *See, generally, Griffin on Collision* § 178 pp. 413–414 (1949).

■ The principal legal issue in this case is whether the mutual navigation of the tug and ship was governed by the crossing (or "starboard hand") rule (Article 19 of the Inland Rules),[10] or by the meeting rule (Article 18, Rule I).[11]

The tug strongly asserts that this was a crossing situation. Since the tug was, at all

relevant times prior to collision, on the starboard bow of the ship, and since the tug presented only its port running light to the ship for a period of almost three minutes prior to collision, Captain Solberg (of the ship), Captain Cornelius (of the tug), the mate in charge of the Jane McAllister, and the tug's expert witness all agreed that the situation was a crossing situation. Moreover, the configuration of the vessels on the diagrams presented at trial matches that found in § 80.13(c) (Fifth) of the Pilot Rules, i. e., "two steam vessels . . . approaching each other at right angles or obliquely in such manner as to involve risk of collision". It is urged that this is a clear application of the crossing rule, requiring the burdened vessel (the ship) to keep out of the way of the tug by either passing astern of her or, in the alternative, by slackening speed, stopping, or reversing. Correlatively, the tug is required to hold course and speed. *See* Articles 19, 21, 22, 23;[12] Pilot Rules §§ 80.7, 80.9. Finally, the tug argues that *The Boston Socony*, 63 F.2d 246 (2d Cir. 1933) has already determined that navigation in this portion of the East River is, or can be, governed by the crossing rule.

In response, the ship argues that the convergence of the ship and tug should have been governed by the meeting rule (Article 18, Rule I), relying chiefly upon the decision of Judge Learned Hand in *City of New York v. American Export Lines*, 131 F.2d 902 (2d Cir. 1942). In that case, the court ruled that, since the East River was not a "narrow channel" within the meaning of Article 25, there was no duty of vessels to keep to the starboard side of the channel. However, the court also appeared to rule that vessels approaching each other in the river were governed *only* by Article 18, Rule I, i. e., the meeting rule: "It is now hardly necessary to say that in a crooked channel the test whether the relative position of two vessels requires them to pass port to port or starboard to starboard, is not their relative headings when one is in one

10. 33 U.S.C. § 204.

11. 33 U.S.C. § 203.

12. 33 U.S.C. §§ 204, 206, 207, 208.

reach of the channel and the other in the other. Their duties are fixed by their positions in the channel itself—strictly by their relative headings if the channel were straight. *Construction Aggregates Co. v. Long Island R. Co.* 2 Cir., 105 F.2d 1009." 131 F.2d at 905.

The ship urges that this portion of the opinion precludes the applicability of the crossing rule in the instant case. It argues that application of the rule of the *City of New York* case requires a finding that the ship and tug should have passed starboard to starboard, as in a meeting situation, because the intended courses of the vessels and their respective positions in the channel at the time of sighting would have safely taken each other starboard to starboard.

While it is not clear that the *City of New York* case stands for the proposition that there can be no crossing situation between approaching vessels in the East River,[13] it seems clear to this court that the rule of *City of New York* is more directly applicable to this situation than that of *The Boston Socony, supra,* and that Article 18, Rule I is applicable, rather than Article 19.

It is true that there was testimony by three eyewitnesses to the effect that this was perceived as being a crossing situation. It is also true that, for a period of almost three minutes preceding the collision, the tug was on the starboard bow of the ship, with only its port sidelight visible to the ship's pilot. However, the fact remains that, when the tug was initially sighted by the ship as she started across the range, the tug presented a frontal aspect, with both sidelights showing, and was roughly in the middle of the river. Not only were both sidelights seen by the pilot on the ship, but the mate on the Jane McAllister, which was some distance to the right of the ship, also saw both sidelights. Therefore, the tug must have been heading *somewhat* to the northwest, i. e., diagonally across the river, as it proceeded upstream. (The mate on the Jane McAllister, in fact, described the

tug as just completing a "sweeping turn" which she had begun apparently below the Williamsburg Bridge.) It was only when the tug's captain began to worry whether there was enough room for a port to port passage that he began, without announcement, his turn to the right which created the apparent crossing situation.

Irrespective of where the tug captain thought he was in the river, it appears clear that he was in the middle of the river adequately situated to make a perfectly safe starboard to starboard passage with the tanker, which was proceeding across the river on the range to reach the deep water on the Brooklyn side. The port to port passage initially envisioned by Captain Cornelius would have taken the ship perilously close to shoal water. If the tug had continued from the middle of the river to proceed up the river over the shallow water on the Manhattan side toward its avowed navigational goal, the westerly channel near Roosevelt Island, a safe and proper starboard to starboard passage could have been negotiated. Only when it improperly and unnecessarily turned toward the Brooklyn shore was a hazardous situation created.

This approach was, therefore, governed by the meeting rule, Article 18, Rule I. The fact that the tug was initially sighted several degrees off the ship's bow does not invalidate this conclusion, as the phrase "end on, or nearly so" in Rule I has been given a broad construction when applied to situations involving vessels approaching each other in rivers.[14] Moreover, the character of this confrontation as a meeting situation was not destroyed by the subsequent right turn of the tug, which then presented a port aspect to the ship. *Griffin, supra,* § 22 pp. 34–35. It is certainly true that vessels navigating in restricted waters such as the East River may be expected to change headings more frequently than those navigating on the open seas. It is also true that these turns might, under some circumstances, conceivably alter the

13. Cf. *Farwell's Rules of the Nautical Road* at 271–272 (4th ed. 1968); *The Boston Socony, supra.*

14. *Farwell, supra,* at 271; *City of New York, supra.*

character of the approaching situation as, for example, if the tug in this case had to go from the center of the river to dock at a pier in the Greenpoint section of Brooklyn, thereby crossing the range. However, that is not the case here, where there was absolutely nothing to prevent the tug from continuing over to the Manhattan side of the river, and where the ship's intended course across the river on the range was perfectly clear to the tug's captain.

This case is clearly distinguishable from *The Boston Socony,* therefore, since it appears that the ships in that case were at no time in a meeting situation. Indeed, both ships involved in that collision were heading upstream, but were each crossing the channel diagonally, one from west to east, and one from east to west.

■ Since the court holds that this was a meeting situation in which a starboard to starboard passage would have been proper, both vessels were under an obligation to sound two short blasts of the whistle to indicate their intent to effect such a passage. Article 18, Rule I. Neither vessel did so, and that omission contributed to the collision. However, the tug's error in coming right was the primary cause of the collision.

The tug was also at fault in other respects. In the first place, while there is no express requirement that vessels stay to the starboard side of the channel, it does appear to the court to be a violation of, alternatively, the General Prudential Rule [15] or the Rule of Good Seamanship [16] for the tug to have been proceeding up the center of the river. While the tug captain thought he was just off the Brooklyn shore where the flood tide would have tended to set him, the testimony as a whole is clear that he was

virtually in the middle of the river, just into the deep water channel. The testimony also indicated that there was a common practice, of which the tug captain either was or should have been aware, for shallow draft vessels to keep to the Manhattan side of the river, leaving the deep water free for deep draft vessels. The tug captain clearly could have utilized this route, since he was planning to pass Roosevelt Island in the westerly channel anyway. Alternatively, if the tug had actually stayed close to the Brooklyn piers, where the tug captain thought he was, the deep water channel would have been free for traffic requiring such depth. However, the tug took neither of these courses and, instead, made itself a floating hazard to navigation by passing up the center of the river. This choice of route clearly contributed significantly to the collision.

■ Both the ship and the tug were in violation of Article 18, Rule III when their respective maneuvering officers were in doubt as to the intentions of the other vessel and failed to sound the danger signal. Indeed, this entire collision could probably have been avoided if there had been prompt signals to facilitate communication. It is no answer to argue, as does the ship, that the pilot's omission was harmless, since the tug captain was already aware of the confusion and taking some action. Whether, if he had heard a danger signal, Captain Cornelius might have increased speed, or come more sharply to the right, or turned to the left, or backed down is not for this court to speculate. Since the ship violated the statute, it has the burden of showing that its fault *could not have been* a cause of the collision, and this it cannot do. *The Pennsylvania,* 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874). Neither can the tug.

**15.** Article 27 (33 U.S.C. § 212): "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

**16.** Article 29 (33 U.S.C. § 221): "Nothing in these rules shall exonerate any vessel, or the

owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The court further finds that the captain of the tug was not properly qualified to navigate his vessel and tow through the East River at night. Although there was, at the time of the accident, no requirement that a tug captain bear a Coast Guard license, the following factors lead the court to the conclusion that Captain Cornelius was not competent for his task: his lack of appreciation of the actual position of his vessel in the river, his lack of familiarity with the danger signal rule, his failure to sound the danger signal, his apparent misunderstanding of directional terminology on the river, and, most importantly, his error in turning a safe starboard to starboard meeting situation into a situation of peril.[17] While it is by no means necessarily true that the recipient of formal training or the holder of a license is a better mariner than one who has gained his experience on the job, the totality of circumstances in this case seems to indicate that the tug captain was not properly qualified for his assigned task, and that his lack of competence was a contributing factor in this collision.

Since there is no speed limit in this part of the East River, and since it appears that the ship could have safely navigated across the range and effected a starboard to starboard passage with the tug if the tug had not turned erratically to the right, the court does not find the ship at fault for traveling at an excessive rate of speed.

In view of the above-cited factors, all of which contributed to the collision unless otherwise indicated, the court finds that the tug was responsible for 80% of the damages and that the ship was responsible for the remaining 20%. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). Since none of the parties presented any evidence concerning the extent of their respective damages,

the case is referred to Magistrate Schreiber to determine and apportion damages in accordance with this opinion, unless the respective parties can stipulate as to the amount and division of such damages within thirty days from the date of this opinion.

---

17. Even if the court were to assume that this was a crossing situation in which the tug was privileged, the tug would have also been in error in failing to maintain her course and speed to provide the burdened vessel with a predictable point of reference with which to maneuver. A reduction in speed, such as that made by Captain Cornelius in this case (before he could be said to be *in extremis*), would merely render more difficult any effort of the ship to pass astern of the tug, as happened here when the pilot belatedly tried to comply with the tug's erroneous turn to starboard. Thus, even if the situation were what the tug captain thought it to be, he was in error.